**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In Re: Tasigna (Nilotinib)<br>Products Liability Litigation | MDL No. 3006 |

## NOVARTIS PHARMACEUTICALS CORPORATION'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TRANSFER OF ACTIONS

Novartis Pharmaceuticals Corporation ("NPC") opposes Movant Allen Garland's motion to transfer nineteen pending cases involving Tasigna® to a single district for coordinated pre-trial proceedings.[1] Transfer will neither further "the convenience of parties and witnesses," nor will it "promote the just and efficient conduct of [the] action." 28 U.S.C. § 1407(a).[2] More than a year after the first of the pending cases was filed, this litigation does not present the unique coordination challenges for which centralization is designed. There are too few cases pending (nineteen), especially more than five years after the first Tasigna® case filing. All cases have the same overlapping counsel (three plaintiffs' firms). Given the small number of cases and counsel, vehicles for informal coordination are already in place and working. These plaintiffs received treatment with Tasigna® for chronic myeloid leukemia ("CML"), a rare cancer most common among the elderly, which left untreated is fatal. Tasigna® provides important benefits and is effective in controlling CML among a cancer population that has significant cardiovascular risks independent of Tasigna®. Thus, case specific issues will dominate this litigation, especially given the specific causation defenses and local witnesses unique to each matter. Centralization should, therefore, be rejected.

---

[1] After the filing of Movant's motion, Movant's counsel filed a nineteenth action. *Riley v. Novartis Pharmaceuticals Corporation*, Case No. 8:21-cv-00979 (M.D. Fla.).

[2] Transfer of the cases to a single district under 28 U.S.C. § 1404(a) also is not an appropriate alternative here because of all the local case-specific witnesses in the cases. *See* ECF No. 15 (instructing parties to address alternatives to centralization including Section 1404 transfer).

If the Panel determines that centralization is appropriate, NPC requests that the MDL be assigned to the Middle District of Florida, which the Panel has recognized as being "equipped with the resources" needed for an MDL. *In re Accutane Prods. Liab. Litig.*, 343 F. Supp. 2d 1382, 1383–84 (J.P.M.L. 2004). This district is more convenient than the Southern District of Illinois, has the most Tasigna® cases of any federal district, including two of the earliest filed cases, has an efficient docket with a large pool of judges, and has experienced judges including two who have presided over pharmaceutical products liability MDLs.

## BACKGROUND

### I.   Tasigna® Overview

Tasigna® (nilotinib) is a medication used to treat the blood cancer CML. CML is a fatal disease that, if untreated, kills half of those diagnosed within two to three years.[3] In 2021, an estimated 9,110 people will be diagnosed with CML in the United States, and an estimated 1,220 people will die from the disease this year.[4] CML results from a chromosomal rearrangement that triggers the body to manufacture excessive numbers of abnormal white blood cells. Without treatment, CML progresses until more than 30 percent of the cells in the blood or bone marrow are immature, non-functioning blast cells. Life expectancy for a patient who reaches this point is less than twelve months. Today, however, the majority of CML patients treated with medicines

---

[3] Hannah Bower, et al., *Life Expectancy of Patients With Chronic Myeloid Leukemia Approaches the Life Expectancy of the General Population*, 34 J. Clinical Oncology 2851 (2016), https://ascopubs.org/doi/pdfdirect/10.1200/JCO.2015.66.2866.

[4] *See* Leukemia – Chronic Myeloid – CML: Statistics (Jan. 2021), https://www.cancer.net/cancer-types/leukemia-chronic-myeloid-cml/statistics.

like Tasigna® have a life expectancy similar to that of persons who do not have CML.[5]

Tasigna® is a tyrosine kinase inhibitor ("TKI") medication that doctors use to stop CML in its tracks. TKIs are highly effective in treating CML. Tasigna® is a "second-generation" TKI initially approved by the Food and Drug Administration in 2007 to treat CML patients who become resistant to or cannot tolerate Gleevec®, the "first-generation" TKI.[6] In those patients, for whom Gleevec® treatment is inadequate or not tolerable due to side effects, Tasigna® provides an important (and effective) treatment option: clinical trial data shows a 95 percent overall survival rate with Tasigna® after one year, and an 87 percent overall survival rate after two years in this group.[7] In patients who receive Tasigna® at initial CML diagnosis, after five years of treatment, Tasigna® provides a 93.7 percent overall survival rate.[8] Compared to its predecessor, Tasigna® results in earlier and higher response rates and lower risk of CML progressing to its advanced stages.[9] Tasigna® is the only CML therapy with FDA-approved labeling detailing how Tasigna® can suppress CML enough to allow some patients to discontinue CML therapy.[10]

---

[5] *See* James A. Kennedy, MD, PhD and Gabriela Hobbs, MD *Tyrosine kinase inhibitors in the treatment of chronic phase CML: strategies for frontline decision-making*, 13 Curr. Hematol. Malig. Rep. 202 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6023770/.

[6] *See* 2007 Tasigna® label, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2007/022068s000_LBL.pdf.

[7] Tasigna: Efficacy—Second Line, https://www.hcp.novartis.com/products/tasigna/ph-cml/second-line-efficacy.

[8] Tasigna: Efficacy—Frontline, https://www.hcp.novartis.com/products/tasigna/ph-cml/frontline-efficacy/.

[9] Hochhaus A, et al. *Long-term benefits and risks of frontline nilotinib vs imatinib for chronic myeloid leukemia in chronic phase: 5-year update of the randomized ENESTnd trial*, 30 Leukemia 1044 (2016), https://www.nature.com/articles/leu20165.

[10] *Novartis drug Tasigna® is approved by FDA as first and only CML therapy with Treatment-free Remission data in its label*, Novartis.com (Dec. 22, 2017), https://www.novartis.com/news/media-releases/novartis-drug-tasigna-approved-fda-first-and-only-cml-therapy-treatment-free-remission-data-its-label.

Plaintiffs allege that their use of Tasigna® caused various types of atherosclerotic events, such as peripheral arterial occlusion, coronary artery disease, heart attack, and stroke. The average patient diagnosed with CML is sixty-four years old.[11] In the general non-CML population, the prevalence of cardiovascular disease triples in men and doubles in women during the decades of life that patients are most commonly diagnosed with CML (from 8.6 and 8.4 percent in men and women, respectively, at ages 40-59, to 27.1 and 18.2 percent at ages 60-79).[12]

From the first FDA approval of Tasigna® in 2007, the label has warned about cardiac-related adverse events in patients treated with Tasigna® – including sudden death and QT prolongation – in a boxed warning, as well as coronary artery disease in the "Adverse Reactions" section.[13] In November 2011, NPC revised the "Adverse Reactions" section of the FDA-approved Tasigna® labeling to describe reports of peripheral arterial occlusive disease ("PAOD") in patients treated with Tasigna®.[14] In December 2012, FDA approved the addition of reports of "Arteriosclerosis" under the heading "Vascular disease" in Section 6.2 of the label.[15] In January 2014, FDA approved a "Warning and Precaution" for the Tasigna® label containing information about reports of various cardiovascular events, including peripheral arterial occlusive disease (also called PAOD or PVD), ischemic heart disease, and ischemic cerebrovascular events.[16]

---

[11] *See* Leukemia – Chronic Myeloid – CML: Statistics (Jan. 2021), https://www.cancer.net/cancer-types/leukemia-chronic-myeloid-cml/statistics.

[12] Salim S. Varani et al., *AHA Statistical Update, Heart Disease and Stroke Statistics—2021 Update*, 143 Circulation e254, e486 (2021) (Chart 14-1), https://www.ahajournals.org/doi/pdf/10.1161/CIR.0000000000000950.

[13] 2007 Tasigna® label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2007/022068lbl.pdf.

[14] Nov. 2011 Tasigna® label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/022068s008s009lbl.pdf.

[15] Dec. 2012 Tasigna® label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/022068s011lbledt2.pdf.

[16] Jan. 2014 Tasigna® label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/022068s017lbl.pdf.

Since that addition, this "Warning and Precaution" has appeared on the very first page of the label in the "Highlights of Prescribing Information."

## II. Tasigna® Litigation in Federal Court

### A. Prior Tasigna® Cases

NPC's and Movant's counsel have litigated and resolved two prior actions involving Tasigna® in federal court: 1) *Lauris v. Novartis AG, et al.,* No. 1:16-cv-00393 (E.D. Cal.) and 2) *McWilliams v. Novartis AG, et al.,* No. 2:17-cv-14302 (M.D. Fla.). The *Lauris* case was filed on March 22, 2016. The *McWilliams* case was filed on August 23, 2017. Movant's counsel Rich Elias represented plaintiffs in both cases, which were resolved in 2018.

In those cases, NPC produced more than 10.6 million pages of company documents that span from Tasigna®'s first approval in the United States in 2007 through 2014. These documents included, among other things, over 100,000 company emails from fourteen custodians, the Tasigna® regulatory file, and company organizational charts. Movant's counsel also took depositions of six NPC company witnesses. That entire discovery has been made available to all plaintiffs by the agreement of counsel. *See* Decl. of Andrew Reissaus ¶ 8.

### B. Pending Actions

Since March 2020, plaintiffs have filed twenty-one actions involving Tasigna® in federal court (NPC removed two additional cases to federal court). Plaintiffs voluntarily dismissed four cases. Nineteen cases remain pending. The Middle District of Florida has the most pending Tasigna® cases of any federal district court (four), including two of the earliest filed cases from March 2020. Movant's counsel, Elias LLC and/or Onder Law, represent plaintiffs in eight cases. Parker Waichman LLC represents plaintiffs in the remaining eleven cases. These three firms also collectively represent all plaintiffs in pending Tasigna® cases in New Jersey state court, where

they have filed over 130 cases. NPC is the sole defendant and is represented by Hollingsworth LLP.[17]

Although all nineteen pending federal complaints allege that NPC failed to adequately warn that Tasigna® causes cardiovascular events, plaintiffs allege a variety of different injuries (and some allege more than one), including peripheral vascular disease (eleven cases), coronary artery disease (seven cases), stroke (four cases), and heart attack (two cases). These plaintiffs used Tasigna® during different time periods spanning over a dozen years – from as early as 2007 to as recently as 2019. At least three plaintiffs allege they used Tasigna® exclusively after the label was updated in 2014 to include a Warnings & Precautions section about cardiac and vascular events, while the rest allege that they started Tasigna® before that label update. At least two plaintiffs participated in Tasigna® clinical trials where information about Tasigna® and cardiovascular events also was provided to plaintiffs in consent forms.

C.    The Parties' Efforts at Informal Coordination

Through informal coordination among the parties, there has been significant progress on discovery. More than a year into the litigation, the parties have regularly conferred to address discovery matters. No federal court has considered and ruled on a discovery dispute in the nineteen federal cases that have progressed beyond the pleading stage.

The parties have agreed to an ESI Protocol that will be applicable across the federal and state litigations. *See* Reissaus Decl. ¶ 3. The parties also have agreed to a confidentiality agreement applicable across the federal and state litigations. *See id.* at ¶ 4. Plaintiffs have provided medical authorizations, which have been used to collect more than 66,000 pages of

---

[17] Both NPC's and plaintiffs' counsel have associated co-counsel for cases in districts where they are not admitted.

records in the nineteen cases. *Id* at ¶ 5. The parties have exchanged written discovery requests and responses in fourteen of the nineteen cases. *Id* ¶ at 6.

NPC has produced a substantial volume of documents, including, as Movant acknowledges, the more than 10 million pages of documents that were produced in the two prior Tasigna® cases. *See* Movant's Br. at 5, n.3. Movant also acknowledges that NPC has provided updates to that production, including the updated Tasigna® regulatory file. *See id.* NPC has produced updated organizational charts from periods after December 2014 and before 2007. *See* Reissaus Decl. ¶ 10. NPC has provided plaintiffs' counsel with lists of dozens of individuals who worked on Tasigna® in primary functional roles, including individuals who may have been involved with the Tasigna® team's evaluation of cardiovascular events. *See id.* NPC also has produced documents from the following categories: 1) Tasigna® sales force call notes for visits made to each plaintiff's prescribing physicians; 2) an index of non-medical inquiries from and responses to plaintiffs' prescribing doctors; 3) an index of medical inquiries from and responses to plaintiffs' prescribing doctors; 4) NPC's pre-clinical and clinical trial data repositories; 5) an updated collection of standard operating procedures; 6) adverse events and underlying adverse event files regarding plaintiffs' alleged cardiovascular events; and 7) an index of approved Tasigna® promotional materials. *See id.* at ¶ 11.[18] To date, NPC has produced to plaintiffs more than 480,000 documents (more than 530 gigabytes of data and an estimated more than 10.8 million pages), and more documents are forthcoming. *See id.* at ¶ 13.

NPC will produce updated custodial file productions of six individuals whose documents were produced in the prior litigation to cover later time periods after December 2014. *See id.* at

---

[18] NPC has produced case-specific data for fourteen of the nineteen cases filed and will supplement its production for recently filed cases. *See* Reissaus Decl. at ¶ 12.

¶ 14. NPC is willing to produce custodial documents from a reasonable number of additional custodians using reasonable search terms, including per plaintiffs' request, additional terms that differ from those used in the earlier cases. *See id.* at ¶ 15. The parties continue to discuss the appropriate number of custodians and the appropriate additional search terms. *See id.* Recently, plaintiffs' counsel identified the custodians from whom plaintiffs want documents. *See id.* In response, NPC has agreed to produce files for some custodians, and the parties continue to discuss additional custodians and the use of additional search terms beyond those in the prior cases. *See id.* Once the parties reach agreement or obtain a court resolution on these two issues, NPC will produce additional documents.

Plaintiffs' counsel have taken two Rule 30(b)(6) depositions of NPC's corporate representatives, including one on NPC's corporate structure for the Tasigna® unit. *See id.* at ¶ 16. NPC and plaintiffs' counsel have agreed that these depositions and future depositions of NPC's corporate representatives and employees will be applicable across all the Tasigna® cases. *See id.* NPC has also agreed that the six depositions of company witnesses taken in the two resolved Tasigna® cases may be used in the pending cases. *See id.* Movant's counsel has agreed to make the Movant available for deposition, and the parties have agreed to dates for plaintiffs' depositions in three of the pending actions. *See id.* at ¶ 17. Depositions of treating physicians have already been taken in one matter and additional depositions are scheduled in other cases. *See id.* at ¶ 18.

## ARGUMENT

### I.      The Panel Should Not Centralize These Actions.

Section 1407 authorizes the Panel to transfer cases for coordinated pretrial proceedings only where 1) the "actions involv[e] one or more common questions of fact"; 2) coordination will further "the convenience of parties and witnesses"; and 3) coordination "will promote the

just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a). The movant bears the burden of demonstrating that this standard is met. *In re Cable Tie Patent Litig.,* 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). "Where only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate." *In re Hyundai & Kia GDI Engine Mktg., Sales Practices, & Prods. Liab. Litig.*, 412 F. Supp. 3d 1341, 1343 (J.P.M.L. 2019). As shown below, Movant has not met his burden.

>    **A.    Centralization Is Not Appropriate Because There Are Too Few Cases, Each of Which Involves the Same Counsel.**

Movant seeks centralization of nineteen pending cases in twelve districts with every single plaintiff represented by one of three law firms (Parker Waichman LLC, Elias LLC, or Onder Law) who are coordinating together in both the federal and state proceedings. In this setting, informal coordination is both practicable and preferable to centralization.

The Panel has denied requests for centralization with similar, minimal numbers of cases. *See, e.g.*, *In re Covidien Hernia Mesh Prods. Liab. Litig.*, 481 F. Supp. 3d 1348, 1349 (J.P.M.L. 2020) (twelve actions in nine districts too few to warrant centralization); *In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig.*, 273 F. Supp. 3d 1357 (J.P.M.L. 2017) (denying centralization of sixteen actions pending in six districts); *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 273 F. Supp. 3d 1360 (J.P.M.L. 2017) (denying centralization of fifteen product liability actions). The presence of common counsel also weighs against centralization because there is little to gain through coordination where counsel are the same across the cases. *See, e.g.*, *In re Covidien*, 481 F. Supp. 3d at 1349; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013); *In re: Cymbalta (Duloxetine) Prods. Liab. Litig.*, 65 F. Supp. 3d 1393, 1394 (J.P.M.L. 2014) (finding overlap among counsel – two counsel for plaintiff and one counsel for defendant – in twenty-five actions suggested that informal

coordination with remaining common discovery and other pretrial matters should be practicable).

Movant references the fact that "this Panel has frequently ordered the multidistrict transfer of pharmaceutical and other product liability cases." Movant's Br. at 8. That fact is of no moment. "A grant of centralization though does not guarantee that [the Panel] will find centralization appropriate in another litigation alleging similar claims, and the Panel makes each of its decisions based on the circumstances presented by a particular litigation at the time." *In re Covidien*, 481 F. Supp. 3d at 1349; *see also In re CVS Caremark Corp. Wage & Hour Emp. Practices Litig.,* 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) (stating that the Panel does "not 'rubber stamp' in any docket").

Movant asserts that "there will certainly be many more," cases filed, and Movant's counsel are investigating "over 300 additional, potential Plaintiffs." *See* Movant's Br. at 9 & n.3. But the Panel is "disinclined to take into account the mere possibility of future fillings in [its] centralization calculus." *In re Lipitor*, 959 F. Supp. 2d at 1376. Moreover, the litigation history does not support Movant's conclusory assertion. Since March 2020, when the first of the pending actions was filed, there have only been twenty-three actions in federal court, and four of these cases have been voluntarily dismissed by plaintiffs. Only three of the nineteen pending cases were filed this year.[19] The first product liability cases involving Tasigna® were filed in 2016, and were resolved in 2018, with no cases filed in 2018 or 2019. Such circumstances warrant caution against centralization. *See, e.g.*, *In re Covidien*, 481 F. Supp. 3d at 1349 (denying centralization where plaintiffs' firm advertising had been "ongoing for at least three years," but the Panel was "presented with just twelve cases"); *In re Proton-Pump Inhibitor*, 273 F. Supp. 3d at 1362-63

---

[19] Plaintiffs have filed in state court at a much greater rate: seventy-five cases have been filed in New Jersey state court this year, and there are over 130 pending cases in New Jersey state court.

(denying centralization for fifteen actions even though "plaintiffs almost guarantee that the number of involved actions will increase by the hundreds if not thousands").

Movant's citations to Panel orders centralizing relatively small numbers of cases are inapposite. Movant's Br. at 11-12. All decisions cited involved a request to transfer class actions or patent and antitrust claims, and none were pharmaceutical personal injury cases that involve numerous individualized issues that are unique to each action. The one products liability MDL that Movant cites involved putative class actions and allegations of property damage, not personal injury. *Id.* at 12 (citing *In re: Zurn Pex Plumbing Prods. Liab. Litig.*, 572 F. Supp. 2d 1380 (J.P.M.L. 2008)); *In re: Zurn*, Mot. to Transfer at 2-5, MDL No. 1958 (ECF No. 1).

**B.  Centralization Will Not Serve the Convenience of the Parties and Witnesses and Is Unlikely to Result in the Just and Efficient Conduct of the Litigation**.

"Various mechanisms are available to minimize or eliminate the possibility of duplicative discovery even without an MDL." *In re: Crest Sensitivity Treatment & Prot. Toothpaste Mktg. & Sales Practices Litig.*, 867 F. Supp. 2d 1348, 1348 (J.P.M.L. 2012). For example, "[n]otices of deposition can be filed in all related actions" or "the parties can stipulate that any discovery relevant to more than one action can be used in all those actions." *Id.*

That is precisely what has occurred already in the Tasigna® litigation. Movant's contention that the "parties' attempts to coordinate informally have failed," Movant's Br. at 12, is demonstrably false. The parties have agreed to an ESI Protocol and a Protective and Confidentiality Order applicable across the litigation. Since the inception of the litigation, the parties have endeavored to avoid duplicative discovery. NPC has produced millions of pages of documents to plaintiffs, is preparing to produce more, and intends to expand that production further. The parties have agreed that depositions of NPC's witnesses, including the eight taken to date, will apply across the entire litigation. Plaintiffs' counsel have also been working together as

indicated by numerous meet-and-confers with NPC's counsel and the three plaintiffs' firms on global litigation issues. Movant's counsel has represented that it will accept the search terms agreed to between NPC's counsel and Parker Waichman LLC and intends to share a document repository with Parker Waichman. *See* Reissaus Decl. ¶ 7. The extensive amount of informal coordination thus far directly contradicts Movant's contention that centralization is required to prevent duplicative discovery or to enable plaintiffs' counsel to coordinate their efforts and share the workflow. *See* Movant's Br. at 11-12.[20]

In similar circumstances, the Panel has found that centralization is not necessary for the just and efficient conduct of the litigation. *See, e.g., In re: Cymbalta*, 65 F. Supp. 3d at 1394 (denying centralization where defendant produced corporate representatives for Rule 30(b)(6) depositions and produced nearly two million pages of documents); *In re Sorin*, 273 F. Supp. 3d at 1358 (J.P.M.L. 2017) (denying centralization where the parties in six of sixteen actions "already are working successfully to minimize overlapping pretrial proceedings" such as "sharing discovery produced in multiple actions").[21]

Informal coordination has proven effective: NPC has produced more than 480,000 documents, the parties have collected more than 66,000 pages of plaintiffs' medical records, and

---

[20] NPC's support for consolidation within the county where over 130 cases were filed and are pending in state court has no bearing on whether these federal cases should be centralized. *See In re Covidien*, 481 F. Supp. 3d at 1349 (denying centralization where "more than 150 cases are now pending, but almost all have been filed in state court, and most of those in [defendant's] home state"); *see also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 38 F. Supp. 3d 1380, 1381 (J.P.M.L. 2014) (rejecting plaintiff's reliance on Panel's centralization of other Mirena actions alleging different injuries with "a far greater number of actions").

[21] Movant disputes the adequacy of NPC's production. *See* Movant's Br. at 5, n.3. The Panel has found similar accusations unpersuasive. *See In re: Cymbalta*, 65 F. Supp. 3d at 1394 (denying centralization and observing that defendant's production of nearly two million pages of documents was "substantial" notwithstanding plaintiffs' objection to its adequacy). NPC is willing to produce additional documents, but that cannot occur until the parties agree on custodians and search terms or a court resolves any remaining disputes.

depositions are ongoing. Movant claims that NPC's rejection of a proposal to employ a discovery special master demonstrates that informal coordination has failed, justifying an MDL. Movant's Br. at 5. Contrary to Movant's contention, there was never a concrete proposal made by plaintiffs regarding a special master for NPC to reject, but one is not necessary or practical here. In any event, informal coordination does not require NPC to accede to every discovery request from plaintiffs. The Panel has addressed complaints of purported lack of cooperation and found them unpersuasive as a justification for creating an MDL. For example, plaintiffs in *In re Cymbalta* argued in a second attempt to consolidate that the defendant "refused to cooperate in various ways." *In re Cymbalta (Duloxetine) Prod. Liab. Litig. (No. II)*, 138 F. Supp. 3d 1375, 1377, n.4 (J.P.M.L. 2015). In response, the Panel stated: "In our decisions in which we have denied centralization and found cooperation feasible, we have never suggested that such cooperation entails requiring a party to acquiesce to a given motion, agree not to raise a possible claim or defense, or accede to its opponent's use of a particular procedural stratagem." *Id.* Similarly, here, the parties' disagreement on handling of potential future discovery disputes is not a sign that cooperation is no longer feasible. NPC intends to continue coordination efforts.

Movant speculates that future discovery disputes will require court intervention because, in part, "[NPC] has, without conferring with Plaintiffs, unilaterally noticed depositions of several Plaintiffs in the Actions, including Plaintiff Garland." Movant's Br. at 5. Movant fails to mention that with each deposition notice, including to Movant, NPC's counsel invited each plaintiff to propose alternative dates. Reissaus Decl. ¶ 17. Movant argues that the absence of coordination "will also result in multiple motions for protective orders" and "will almost certainly result in inconsistent rulings." Movant's Br. at 11. The reality belies this claim. Not a single motion for a protective order has been filed in any of the nineteen cases, and no federal court has actually

adjudicated any discovery-related motion. Movant's counsel has agreed to provide a date for

Movant's deposition and agreed to dates for depositions of multiple physicians. NPC remains

willing to seek a resolution of discovery disputes without court intervention, where possible.

Movant's counsel worries that without an MDL, it may be necessary to litigate issues,

such as discovery disputes, in more than one circuit. *See Id.* at 5. Implicit in Movant's argument

is an assumption that plaintiffs expect to obtain more favorable rulings from an MDL court and

that there is risk that they could receive unfavorable rulings in individual cases more quickly

than might otherwise occur in an MDL. *See id.* at 5. Movant's argument misconstrues an MDL's

purpose. The Panel has repeatedly held that "the possibility that another district judge may be

more favorably disposed to a particular litigant's position is not a factor in the Section 1407

analysis." *In re Thomas E. Noble Litig.*, 223 F. Supp. 3d 1332, 1333 (J.P.M.L. 2016); *see also In

re: Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009)

("Merely to avoid two federal courts having to decide the same issue is, by itself, usually not

sufficient to justify Section 1407 centralization.").

### C.   There Are Multiple Individualized Facts and Issues That Are Not Common Across The Cases.

Movant contends that centralization is warranted because the factual allegations and legal

issues are "nearly identical." *See* Movant's Br. at 9. Not so. There are disparate and unique issues

to each case that must be addressed on an individual case-by-case basis. The numerous

individualized issues particular to each individual plaintiff will dwarf the few common issues,

and therefore centralization will not facilitate the efficient resolution of case-specific issues. *See

In re CVS*, 684 F. Supp. 2d at 1379 (noting "the potential for significant individual discovery tilts

the balance against centralization"); *In re Boehringer Ingelheim Pharm., Inc., Fair Labor

Standards Act Litig.*, 763 F. Supp. 2d 1377, 1378 (2011) (noting circumstances that "make the

case for centralization less compelling" include the presence of "significant local variances" or where there is "significant localized discovery").

> 1. **Individual issues, such as different alleged injuries and different potential independent causes for those alleged injuries, predominate over the common factual issues claimed by plaintiffs**.

Centralization is not appropriate where, as here, individual issues comprise the overwhelming bulk of the questions to be resolved. *See, e.g.*, *In re Mirena*, 38 F. Supp. 3d at 1381 (denying centralizing to nine actions alleging that Mirena causes intracranial hypertension and related injuries because varying alleged injuries "[gave] rise to a fact-intensive inquiry," such that "individualized causation disputes [were] likely to predominate"). These cases, like those in *In re Mirena*, involve highly individualized issues that are dependent on testimony from each plaintiff's physicians, who are local to the districts where the cases are currently pending.

One key issue in these cases is specific causation – *i.e.*, whether Tasigna® in fact caused each plaintiff's alleged injury. Depositions of local physicians in each case are critical to establishing each particular plaintiff's risk factors for their alleged cardiovascular event. In *In Re: Lipitor*, the Panel denied a motion to transfer twenty-eight cases alleging that Lipitor causes diabetes. *In re: Lipitor*, 959 F. Supp. 2d at 1376. The Panel concluded: "As always in this type of litigation, a highly individualized inquiry is necessary to determine whether any particular plaintiff developed type 2 diabetes as a result of taking Lipitor. Where few cases are filed, the balance tips towards allowing the regular litigation process to resolve those cases." *Id.*

That is especially true in these cases where plaintiffs allege various injuries related to cardiovascular disease. Cardiovascular disease has been the leading cause of death in the United States for decades, afflicts nearly half of American adults, and has numerous well-established risk factors (such as cholesterol, hypertension, diabetes, diet, weight, and smoking) unrelated to

CML or Tasigna®.[22] Each case, therefore, has highly individualized causation issues. *See In re Mirena*, 38 F. Supp. 3d at 1381 n.3 (observing that "intracranial hypertension regularly is diagnosed in individuals who do not use Mirena, which will create further individualized causation issues"). For example, in a case involving a severe alleged injury, several treating physicians who have been deposed disavowed any opinion that Tasigna® caused plaintiff's alleged injury, and instead testified that the presence of significant risk factors could explain plaintiff's cardiovascular disease, including a more than decade-long history of cardiovascular disease that required surgical intervention before Tasigna® treatment started, a history of smoking, obesity, high cholesterol, high blood pressure, and a family history of cardiovascular disease. Reissaus Decl. ¶ 18. The physicians also testified that plaintiff's cardiovascular disease was not abnormal in its progression. *Id.* This critical testimony, obtained from local physicians, is entirely case-specific, with no bearing on any centralized issue, but is integral to the litigation of each plaintiff's claims.

Individual issues are crucial to virtually every aspect of each plaintiff's affirmative claims. In addition to the specific causation-related issues above, there are also issues regarding: 1) the severity of each plaintiff's alleged injury; 2) the discrete warnings provided at the time of use; 3) whether each plaintiff's prescribing physician would have prescribed Tasigna® if a different warning had been given; 4) NPC's knowledge regarding the alleged risk of the alleged injury at the time each plaintiff used the drug; and 5) the appropriate amount of damages, if any. The substantive law applicable to each plaintiff's claims also varies, precluding fair and efficient resolution of these claims in an aggregate setting. State laws differ as to claims of warning

---

[22] *E.g.*, American Heart Association News, *Cardiovascular diseases affect nearly half of American adults, statistics show* (Jan. 31, 2019), https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show.

adequacy, negligence, and wrongful death asserted by plaintiffs, as well as the applicability of affirmative defenses such as statute of limitations (and to what extent a discovery rule applies).

Where, as here, there are few cases, there is overlap among counsel, informal coordination is in place, and individual issues comprise the overwhelming bulk of the questions to be resolved, the balance favors the regular litigation process to resolve these cases. Indeed, the parties' informal discovery coordination process has begun to reveal case weaknesses.[23] Some cases may warrant early summary judgment motions based on the statute of limitations. Those issues would be more effectively addressed case-by-case as they arise, rather than being subject to delays of case-specific issues inherent in centralized proceedings.

> **2.     Different Tasigna® labeling over the years creates individualized issues in each case**.

Because plaintiffs allege use of Tasigna® during different time periods, discovery and potential liability for NPC's conduct will vary across the cases. The failure to warn issue must be evaluated at the particular time of each plaintiff's use of Tasigna® and requires an analysis of the operative Tasigna® label or labels during that use. In cases where plaintiffs began using Tasigna® exclusively after the 2014 update to the label, NPC's conduct prior to the label change is not relevant. Also, two plaintiffs' participation in Tasigna® clinical trials (10.5 percent of the pending federal cases) creates uncommon issues that require separate fact investigation and legal arguments. The necessity for such individualized inquiries suggests, in the background of only nineteen cases, that centralization would not achieve significant efficiencies.

---

[23] The four dismissals thus far all came after NPC reviewed records and communicated to plaintiffs, either through briefing or correspondence, that plaintiffs' claims lacked merit.

II.     **If the Panel Orders Centralization, NPC Requests the Middle District of Florida**.

If centralization occurs, the Panel should not transfer the actions to the Southern District of Illinois. Instead, the Middle District of Florida is the appropriate court for MDL proceedings.

In determining the appropriate location for an MDL, the Panel weighs a variety of factors, including 1) where the most cases and most advanced cases are pending; 2) which court is the most familiar with the issues; 3) where the earliest-filed action is located; 4) the condition of the docket of the potential transferee court; and 5) location of convenience to the defendant. No single factor is dispositive. *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 138 F. Supp. 3d 1381, 1382 (J.P.M.L. 2015). The Panel may also consider where the defendant is located and the convenience to the defendant in determining where to centralize actions. *See, e.g.*, *In re Mobile Telecomm. Techs., LLC Patent Litig.*, 222 F. Supp. 3d 1337, 1338 (J.P.M.L. 2016). On balance, the Middle District of Florida is a more appropriate venue than the Southern District of Illinois.

A.     **The Middle District of Florida Has Experienced Judges, an Efficient Docket, Some of the Earliest Filed Cases, and the Most Tasigna® Cases.**

The Middle District of Florida has thirty district judges, fifteen of whom are senior status. The Middle District of Florida has had a total of seventeen MDLs and therefore has a collection of judges experienced in MDL proceedings, including product liability actions. For example, Judge James S. Moody, Jr., presided over *In re Accutane Prods. Liab. Litig.*, MDL No. 1626, and Judge Anne C. Conway presided over *In re: Seroquel Prods. Liab. Litig.*, MDL No. 1769. In 2020, the Middle District of Florida disposed a total of 6,471 cases with a median time of 6.2 months to termination, including 5,934 cases disposed before pretrial with a median time of 6.1

months to termination.[24] The Middle District of Florida also has three of the earliest filed Tasigna® cases and has the most Tasigna® cases (four). *See In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*, 158 F. Supp. 3d 1375, 1380 (J.P.M.L. 2016) (selecting district with "significant number of related actions" pending); *In re: Light Cigarettes Mktg. & Sales Practices Litig.*, 652 F. Supp. 2d 1379, 1381 (J.P.M.L. 2009) (selecting district with earliest filed cases).

In contrast, the Southern District of Illinois has only one pending action. The Southern District of Illinois has only five district court judges, two of whom were recently appointed to the bench, and one who is on senior status. The Panel has assigned five now-terminated MDLs to the Southern District of Illinois, all presided over by judges who are no longer on the bench. There is no active judge in the district who has been assigned an MDL.

Accordingly, if the Panel centralizes the cases, the Middle District of Florida provides an effective and appropriate venue for centralization. NPC requests that Senior Judges Moody or Conway, both of whom have products liability MDL experience, be assigned the pending actions. Alternatively, NPC requests Judge William Jung, who has one of the earliest filed cases.

### B.     The Middle District of Florida Is as Accessible as the Southern District of Illinois.

Movant's reasons for picking the Southern District of Illinois for centralization appear rooted in the fact that both Movant's counsel Elias LLC and Onder Law are located in St. Louis, Missouri. The Southern District of Illinois may be convenient for these firms, but that is not an appropriate consideration for the selection of an MDL location. *See In re DirectBuy, Inc., Mktg. & Sales Practices Litig.*, 682 F. Supp. 2d 1349, 1350 (J.P.M.L. 2010) ("We have long held that

---

[24] U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending Dec. 31, 2020, https://www.uscourts.gov/sites/default/files/data_tables/stfj_c5_1231.2020.xlsx.

the convenience of counsel 'is not by itself a factor to be considered . . . in the selection of a transferee forum for a group of actions.'")

NPC is headquartered in East Hanover, New Jersey. NPC's counsel for the Tasigna® litigation is Hollingsworth_LLP, in Washington, D.C. While plaintiff-specific witnesses will be all over the country, NPC-related witnesses and documents will be located in the eastern United States. Movant's counsel, who has filed two cases in the Middle District of Florida, has an office in Florida. Parker Waichman is located in Port Washington, New York (and has one case pending in the Southern District of New York), and Bonita Springs, Florida (and has two cases pending in the Middle District of Florida). Transportation will not be an issue. There are direct flights available from St. Louis, Newark, New York City, and Washington, DC to Tampa, Orlando, and Jacksonville. The Middle District of Florida is the appropriate transferee court.

## **CONCLUSION**

For the foregoing reasons, the Panel should deny Movant's motion in its entirety. In the alternative, the Panel should centralize the pending actions in the Middle District of Florida.


Dated:  May 6, 2021                              Respectfully submitted,

                                                 By: /s/ Joe G. Hollingsworth
                                                 Joe G. Hollingsworth, Esq.
                                                 jhollingsworthllp@hollingsworthllp.com
                                                 Hollingsworth_LLP
                                                 1350 I Street Northwest
                                                 Washington, District of Columbia 20005
                                                 Phone: (202) 898-5800
                                                 Fax: (202) 682-1639

                                                 *Counsel for Novartis*
                                                 *Pharmaceuticals Corporation*