# EXHIBIT 6



Elyse A. Shimada
dir 202 898 5877
eshimada@hollingsworthllp.com

April 30, 2021

**VIA ELECTRONIC MAIL**

Raymond C. Silverman
Parker Waichman LLP
6 Harbor Park Drive
Port Washington, New York 11050
rsilverman@yourlawyer.com

      Re: *Colella v. NPC*, No. 3:20-CV-00367 (D. Conn.)

Dear Raymond:

      We write to respond to your letter dated April 6, 2021, proposing fifty-seven custodians. As set forth below, NPC agrees to produce documents from twenty-one of the fifty-seven custodians identified by plaintiffs, and proposes three additional custodians to replace Ms. Raluca Kreft, Global Program Regulatory Director because NPC objects to the production of her custodial documents as described below. NPC objects to production from thirty-six of the custodians that plaintiffs proposed for the reasons also described below. Notwithstanding the positions set forth herein on NPC's willingness to produce documents from custodians, NPC's ability to produce documents from many of said custodians is contingent on agreement or court resolution of the appropriate search terms to be utilized. We will address the plaintiffs' proposed search terms in a separate letter.

      At the outset, we must point out that plaintiffs could already have received productions using the *Lauris* search terms from many of the custodians from whom NPC is now agreeing to produce documents had plaintiffs indicated that they wanted custodial documents from those individuals previously. On September 21, 2020, NPC provided an initial list of twenty-nine employees in "primary functional roles involving Tasigna® who NPC reasonably expected to have discoverable information" pursuant to the ESI protocol entered in this case. Twenty-one of those twenty-nine employees are on the list plaintiff provided on April 6. NPC is agreeable to producing custodial documents from nineteen of those twenty-one custodians using the *Lauris* search terms and will provide additional documents (if any) responsive to additional search terms that can be agreed to by the parties or chosen by a court.

      NPC objects to production of only Ms. Elizabeth Rosenkrantz and Mr. Mohit Rawat from that list on the grounds that they are in global marketing, which Mr. Richard Fosko testified does

Raymond C. Silverman
April 30, 2021
Page 2



not direct marketing activities in the United States. Dep. of Richard Fosko at 141:11-20 (Mar. 18, 2021) (testifying that global marketing is responsible for marketing activities *outside* the United States). Despite having NPC's initial list of potential custodians, as well as more than 10.5 million pages of NPC's documents and the transcripts of six depositions of company witnesses, plaintiffs' counsel did not request any of those twenty-one custodians until almost seven months after NPC's September 2020 disclosure.

**I. NPC Agrees to Produce Documents from Twenty-One Custodians, Subject to Agreement on Search Terms.**

As described below, NPC agrees to produce documents from the following custodians, subject to agreement on search terms.

**A.** *Lauris* **custodians who continued to be involved with Tasigna® after December 31, 2014.**

1. Aby Buchbinder, Global Clinical Program Head (May 2013 – July 2017)
2. Karen Habucky, Global Program Regulatory Director (GPRD) / US Medical Strategy Head, Malignant Hematology (July 1, 2012 – 2015 (GPRD); June 2016 – August 2018 (US Medical Strategy Head))
3. Katie Chon, Associate Director / Director, Drug Regulatory Affairs (2013 – 2016)
4. Mary Aghoghobvia, Brand Safety Leader (Oct. 2013 – Mar. 2015)
5. Neil Gallagher, Global Clinical Program Head / Global Program Head (2006 – 2016)
6. Richard Woodman, Global Brand Medical Director (2006 – 2015)

NPC agrees to supplement the productions of the six former *Lauris* and *McWilliams* custodians identified above who held their Tasigna® positions beyond the *Lauris* timeframe of December 31, 2014, subject to agreement on search terms. We originally understood that plaintiffs agreed to use the *Lauris* search terms for the updates on these custodians' documents. Based on your April 23, 2021 email, we understand that is not the case. Your co-counsel in many of the New Jersey cases, Mr. Rich Elias, has indicated to us that productions of the *Lauris* custodians should be updated if they continued on the Tasigna® team past 2014 and that productions need to proceed. We share your co-counsel's concern that additional productions of custodians' documents need to proceed. We have already begun reviewing the updates for these six *Lauris* custodians using the *Lauris* search terms in absence of an agreement with Parker Waichman on search terms. As noted above, we are preparing a written response to plaintiffs'

Raymond C. Silverman
April 30, 2021
Page 3



modified proposed search terms, which we believe will help guide further discussion between the parties on this topic.

> **B. Non-*Lauris* custodians for whom NPC will produce documents subject to agreement on search terms.**
>
> 7. Christopher Kier, Executive Medical Director (2013 – 2015)[1]
>
> 8. David Domsic, Executive Director of Marketing, Hematology (Nov. 2017 – Dec. 2020)
>
> 9. Haisong Ju, Acting Global Program Safety Leader (Mar. 2018 – May 2018)
>
> 10. Johannes Wolff, US Regional Medical Director (Dec. 2015 – Mar. 2017)
>
> 11. Manu Sondhi, Brand Safety Leader (Mar. 2015 – Oct. 2016)
>
> 12. Michael Petroutsas, Sr. Director, Marketing CML, CLL & Multiple Myeloma (Jan. 2014 – July 2016)[2]
>
> 13. Shilpa Shah-Mehta, Executive Director, Hematology Marketing (Oct. 2016 – Nov. 2017)

NPC agrees to produce documents from these seven custodians, who succeeded *Lauris* custodians in similar functional roles on the Tasigna® team. NPC will review and produce custodial documents from the seven non-*Lauris* custodians using the search terms that the parties agree to or a Court requires.

> **C. *Lauris* custodians whose productions are complete.**
>
> 14. Calvin McNeill, Executive Director, Brand Safety (2008 – 2012)
>
> 15. Darshan Wariabharaj, Associate Director / Director, DRA (Sept. 2007 – July 2012)
>
> 16. Frank Hong, Brand Safety Leader (May 2009 – Mar. 2012)
>
> 17. Laurie Letvak, Global Program Head (2008 – 2012)
>
> 18. Pamela Sheridan, Brand Safety Leader (Dec. 2012 – Oct. 2013)

---

[1] NPC only agrees to produce Mr. Kier's emails for his time on the Tasigna® team that extends beyond the *Lauris* timeframe – from Jan. 1, 2015 – Dec. 31, 2015. As noted in section II.C. below, it is unduly burdensome and not proportional for NPC to produce documents for Mr. Kier from within the *Lauris* time period.

[2] NPC only agrees to produce Mr. Petroutsas' emails for his time on the Tasigna® team that extends beyond the *Lauris* timeframe – from Jan. 1, 2015 – July 31, 2016. As noted in section II.C. below, it is unduly burdensome and not proportional for NPC to produce documents for Mr. Petroutsas from within the *Lauris* time period.

Raymond C. Silverman
April 30, 2021
Page 4



19. Rebecca Jolley, VP Global Product Strategy, Disease Leader (Jan. 2012 – Oct. 2014)

20. Roger Waltzman, Global Clinical Program Head (Mar. 2012 – Apr. 2013)

21. Tracy Goodridge, Global Product Strategy, Sr. Director, CML/Tasigna (June 2011 – Aug. 2014)

The eight *Lauris* custodians identified above left their Tasigna® roles prior to December 31, 2014. NPC has already produced in this case documents contained in their custodial files that contain the *Lauris* search terms. Accordingly, the productions from these custodians regarding Tasigna® are complete.

### D. NPC agrees to three additional custodians, subject to plaintiffs withdrawing their request to include Ms. Kreft.

NPC objects to producing custodial documents from Ms. Raluca Kreft (Global Program Regulatory Director (2016 – Aug. 2020)) on the grounds discussed in Section II.A. below. If plaintiffs agree to withdraw their request for custodial documents from Ms. Kreft, NPC will agree to produce documents (upon resolution of search term disputes) from three additional custodians from the U.S. regulatory function for Tasigna® who were in their roles during the time periods covered by Ms. Kreft:

1. Omer Munir, Director, Drug Regulatory Affairs (2016 – Nov. 2017)

2. Alexandra Hendzel, Global Program Regulatory Manager (Nov. 2017 – Sept. 2019)

3. Parth Patel, Global Program Regulatory Manager (Sept. 2019 – Sept. 2020)

These three regulatory employees had primary responsibility for day-to-day interactions with the FDA, the regulatory entity at issue in these cases, *see, e.g.*, Fosko Dep. at 187:14-24 ("often, the U.S. DRA individual would do the day-to-day interactions with the FDA"). Their documents are more relevant to these cases than those held by Ms. Kreft.

### II. NPC Objects to Producing Documents from Thirty-Six Custodians of Plaintiffs' Proposed List of Fifty-Seven Custodians.

NPC objects to productions from the following custodians, who are discussed in six discrete groups:

Raymond C. Silverman
April 30, 2021
Page 5



A. **NPC objects to producing documents from any custodian who is/or was outside the United States when they worked on Tasigna® and/or is or was not an employee of NPC.**

1. Aleksandra Sarnecka, Global Program Safety Leader (Oct. 2016 – Mar. 2018)
2. Bernd Eschgfaeller, Project Leader (2006 – 2008)
3. Dagmar Wirth, Director, Regulatory CMC (1987 – 2007)
4. Danielle Roman, Director, Preclinical Safety Assessment (1994 – present)
5. Gopal Krishna Sharma, Global Program Safety Leader (June 2020 – Oct. 2020)
6. Luis Velez, Global Program Safety Leader (June 2018 – June 2020; Oct. 2020 – present)
7. Raluca Kreft, Global Program Regulatory Director (2016 – Aug. 2020)

NPC objects to producing documents from custodians who work or worked outside the United States and/or who are or were not NPC employees during their work on Tasigna® on the ground that such production would be unduly burdensome and not proportional to the needs of the case. Individuals working overseas are generally not employees of NPC, but of other Novartis entities. While NPC is willing to discuss seeking voluntary production of documents from certain custodians employed by other Novartis entities, generally the burden of production of foreign custodial files is undue and discovery of custodial files of individuals working in other countries is not proportional to the needs of a U.S. products liability case. The undue burdens imposed by such production include the costs of acquiring the information from NPC's foreign counterparts, which include the costs and burden associated with compliance with foreign data privacy laws requiring redaction of privacy information such as names, addresses, and telephone numbers of foreign custodians. Moreover, there are disabling statutes that prevent certain of NPC's foreign affiliates from producing documents if such production is compelled by court order.

Generally, there is a U.S.-based counterpart for each role that these overseas individuals fill on the Tasigna® team. NPC is willing to discuss possible production of documents from U.S.-based custodians in lieu of producing documents from these custodians located outside the United States, provided that the proposed custodian is in a functional area to which NPC does not object (discussed below).

Raymond C. Silverman
April 30, 2021
Page 6



    **B. NPC objects to producing documents from any custodian who was on the Tasigna® team exclusively during periods pre-dating Tasigna®'s approval by FDA in October 2007.**

1. Bernd Eschgfaeller, Project Leader (2006 – 2008)[3]

2. Dagmar Wirth, Director, Regulatory CMC (1987 – 2007)

3. Denise Williams, Executive Director, US Clinical Development and Medical Affairs (June 2006 – Nov. 2010)

4. Leila Alland, Sr. Clinical Research Physician / Clinical Program Leader (Nov. 2003 – Mar. 2006)

5. Noel Clarke, Sr. Director, Global Brand Leader (2004 – Apr. 2008)

6. Phil Bentley, VP of Preclinical Safety (Jan. 2004 – Jan. 2010)

7. Robert Miranda, Director / Global Program Regulatory Director (2004 – July 2012)

8. Steven Engelhardt, VP Sales (2003 – 2008)

9. Volker Fischer, Executive Director, Absorption, Distribution, Metabolism and Excretion Section, Preclinical Safety (1995 – 2007)

    The only basis for discovery from individuals involved in Tasigna® exclusively in the pre-approval timeframe would be a claim that NPC had failed to disclose data to FDA to obtain approval. Such claims are preempted by *Buckman Co. v. Plaintiffs' Legal Community*, 531 U.S. 341, 350 (2001), which precluded claims based on purported misstatements or omissions to FDA because the FDA is given sole power to pursue relief for claims of fraud on the FDA. *Id.* ("[s]tate-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives"). Thus, documentary discovery and testimony about whether NPC misrepresented or failed to disclose data to FDA in seeking approval of Tasigna® is not available because it is not relevant to a cognizable claim against NPC. To the extent plaintiffs seek the scientific and medical data generated prior to FDA's approval in 2007, plaintiffs already have the regulatory submissions that contain that information. Those documents contain the scientific and medical data that plaintiffs might contend is relevant to the issue of medical causation. Because they cannot be relevant to any cognizable claim, discovery of custodial documents from this time period would be unduly burdensome and disproportionate to the needs of the case.

---

[3] Several of these individuals continued on the Tasigna® team after its initial U.S. approval in October 2007. However, all left the Tasigna® team within the time period covered by the prior *Lauris* productions (see II.C. below).

Raymond C. Silverman
April 30, 2021
Page 7



    C. **NPC objects to additional custodians from the *Lauris* timeframe of October 2007 to December 31, 2014.**

1. Anke Meyer, US Brand Director – Tasigna (Sept. 2007 – 2008)
2. Bernd Eschgfaeller, Project Leader (2006 – 2008)
3. Bill Hinshaw, VP Business Franchise Hematology Head (Jan. 2008 – July 2010)
4. Denise Williams, Executive Director, US Clinical Development and Medical Affairs (June 2006 – Nov. 2010)
5. James Campbell, Sr. Brand Director (2012)
6. Jane Vesotsky, Sr. Product Director, Global Product Strategy (July 2012 – Nov. 2014)
7. Margaret Dean, Global Brand Director (June 2010 – Jan. 2012)
8. Margaret Woo, Sr. Associate Director (Aug. 2012 – 2013)
9. Mark Sims, US Brand Director / Sr. Director, CML (2008 – Feb. 2012)
10. Nancy Grande, Brand Safety Leader (2007 – May 2009)
11. Noel Clarke, Sr. Director, Global Brand Leader (2004 – Apr. 2008)
12. Phil Bentley, VP of Preclinical Safety (Jan. 2004 – Jan. 2010)
13. Philippe Drouet, VP Business Franchise Hematology Head (July 2010 – Sept. 2014)
14. Reshema Kemps-Polanco, Sr. Director, Leukemia Franchise Marketing, Novartis Oncology (Feb. 2012 – Sept. 2014)
15. Richard D'Addabo, Associate Director (2008 – 2010)
16. Robert Miranda, Director / Global Program Regulatory Director (2004 – July 2012)
17. Solveig Ericson, Sr. Medical Director (Dec. 2010 – 2013)
18. Steven Engelhardt, VP Sales (2003 – 2008)
19. Vivian Cheung, Global Brand Director / Sr. Product Leader (Apr. 2008 – 2012)

    For the timeframe covered by the *Lauris* productions (October 2007 to December 31, 2014), NPC objects to producing additional custodians beyond the fourteen custodians already produced in *Lauris* (listed in Sections I.A. and C. above). Plaintiffs already have over 460,000 documents, totaling more than 9.2 million pages during that timeframe from fourteen custodians, plus the regulatory file and additional documents from non-custodial data sources for that same

Raymond C. Silverman
April 30, 2021
Page 8



time period. As we have stated many times, there is no need to undertake the burden to produce additional materials from that timeframe. The prior productions are sufficient to litigate issues related to the time period extending from approval to the end of 2014.

Plaintiffs' list contains nineteen names of individuals who did not work on Tasigna® at any point after the *Lauris* time limitation. In *Lauris*, Mr. Elias sought discovery from forty-one identified custodians. NPC objected, initially proposing discovery from eight custodians. The court's final ruling denied plaintiffs' request to compel production from four high-level executives, including Philippe Drouet, who is identified in plaintiffs' list of fifty-seven custodians dated April 6, 2021. *Lauris v. Novartis Pharm. Corp.*, No. 1:16-cv-00393-LJO-SAB, Dec. 8, 2016 Order (attached as Ex. A) (hereinafter "*Lauris* Order"). Plaintiffs' list of fifty-seven custodians here includes five other individuals Mr. Elias requested in *Lauris*, but dropped as a part of the court-mediated custodian selection process: Robert Miranda, Bernd Eschgfaeller, Bill Hinshaw, Noel Clarke, and Margaret Dean. During the hearing on plaintiffs' motion to compel additional custodians, NPC offered to include custodians beyond the initial eight it offered, and the parties ultimately agreed to a list of fourteen custodians (NPC's initial eight, plus six additional custodians). NPC produced documents for those fourteen custodians from the time period between Tasigna®'s approval in 2007 through the Court's cutoff date of December 31, 2014.[4] In the same order, the court rejected plaintiffs' request to extend the time period through the present. *Lauris* Order at 8-10, 12. Now, plaintiffs request production from nineteen pre-2015 custodians in addition to the fourteen *Lauris* custodians, without any explanation for why plaintiffs need that discovery or why the prior production was insufficient. To the extent that plaintiffs believe something in the prior production is inadequate, please identify what plaintiffs believe is missing and NPC will consider the request. Otherwise, NPC objects to production of these custodians as duplicative, unduly burdensome and not proportional to the needs of these cases.

**D. NPC objects to custodians in research and development and preclinical studies.**

1. Paul Manley, Executive Director, National Leading Scientist (1997 – Oct. 2020)

2. Danielle Roman, Director, Preclinical Safety Assessment (1994 – present)

3. Phil Bentley, VP Preclinical Safety (Jan. 2004 – Jan. 2010)

---

[4] Plaintiffs' counsel in *Lauris* sought documents from the pre-approval timeframe, but dropped that demand and did not move to compel production.

Raymond C. Silverman
April 30, 2021
Page 9



4. Volker Fischer, Executive Director, Absorption, Distribution, Metabolism and Excretion Section, Preclinical Safety (1995 – 2007)

NPC objects to producing documents from these four custodians who are involved in the functional areas of research and development and pre-clinical studies. These areas are not relevant to the claims at issue and are not proportional to the needs of the case, which involve questions of causation in humans and the adequacy of labeling. In a world of clinical trial evidence, preclinical and preliminary early studies lack even probative value to causation. *See Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1209 (10th Cir. 2002) (affirming district court's opinion animal studies were unreliable to prove causation); *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (finding chemical and animal studies not relevant to the cause of plaintiff's injuries); *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 991 (8th Cir. 2001) (finding animal studies plaintiff's experts relied upon insufficient to prove causation). Thus, requiring production from these custodians seeks irrelevant material and is therefore unduly burdensome and not proportional to the needs of these cases. Moreover, to the extent plaintiffs seek documents predating FDA approval of Tasigna® from these custodians they are not relevant and production would be unduly burdensome and not proportional for the reasons discussed in Section II.B.

### E. NPC objects to producing documents from custodians who held positions exclusively in global and strategic marketing and sales for Tasigna®.

1. Bernd Eschgfaeller, Project Leader (2006 – 2008)
2. Elizabeth Rosenkrantz, Sr. Director, Global Brand Leader, Tasigna (Aug. 2013 – Feb. 2018)
3. James Campbell, Sr. Brand Director (2012)
4. Jane Vesotsky, Sr. Product Director, Global Product Strategy (July 2012 – Nov. 2014)
5. Margaret Dean, Global Brand Director (June 2010 – Jan. 2012)
6. Michele Ravara, Global Disease Lead CML / AML (Feb. 2017 – Aug. 2018)
7. Mohit Rawat, Global Disease Lead, CML (Aug. 2018 – present)
8. Noel Clarke, Sr. Director, Global Brand Leader, Tasigna (2004 – Apr. 2008)
9. Richard D'Addabo, Associate Director (2008 – 2010)
10. Vanessa Thirion-Cullity, Global Brand Strategy Leader; Global Disease Strategy Leader, Leukemias (Feb. 2015 – Feb. 2017)

Raymond C. Silverman
April 30, 2021
Page 10



      11. Vivian Cheung, Global Brand Leader / Sr. Product Director (Apr. 2008 – 2012)

    Global sales and marketing is not relevant to the issues in these cases because global marketing does not direct marketing activity in the United States. *See* Fosko Dep. at 141:11-20 (testifying that global marketing is responsible for marketing activities *outside* the United States). Sales and marketing materials are also not relevant unless the information sought is tied to specific information that the prescribing physician allegedly read, saw, or heard, and/or that led to the injuries alleged in this case. Because global marketing does not direct marketing activity in the United States, it is even less likely that the global marketing materials affected any U.S. oncologist's decision to prescribe Tasigna®.

    Strategic marketing also is not relevant because, although the individuals in strategic marketing help set the U.S. marketing plans, these individuals did not have input into creating the marketing materials and implementing marketing activities in the United States. Fosko Dep. at 162:10-21 ("[i]t would be the U.S. marketing folks that would actually take that strategic communication plan and implement it in deciding how and what advertising material vehicles that would need to be developed."). The U.S. team had the responsibility for ensuring marketing materials comply with FDA regulations. *Id.* at 163:19-164:11.

**F.  NPC objects to producing documents from high-level employees who are not involved in day-to-day decision making regarding Tasigna® and would be unlikely to have unique, relevant information concerning Tasigna®.**

    1.  Bill Hinshaw, VP Business Franchise Hematology Head (Jan. 2008 – July 2010)

    2.  David Lennon, Oncology Business Franchise Head (Mar. 2015 – May 2017)[5]

    3.  Harout Semerjian, Hematology Business Franchise Head (Jan. 2015 – Oct. 2016)

    4.  Philippe Drouet, VP Business Franchise Hematology Head (July 2010 – Sept. 2014)

    5.  Sandrine Piret-Gerard, VP and Head, US Hematology (Oct. 2018 – Feb. 2020)

    6.  Steven Engelhardt, VP Sales (2003 – 2008)

    7.  Thomas Weigold, US Business Franchise Head Hematology (Mar. 2017 – Sept. 2018)

---

[5] NPC does not reasonably anticipate that Mr. Lennon will have unique discoverable materials in this litigation because his Oncology Business Franchise Head title corresponded to Solid Tumor Products and he was not within the separate hematology business unit that was responsible for Tasigna®. Although he was listed in the deposition exhibit compiled for the 30(b)(6) deposition on corporate structure, that was in error.

Raymond C. Silverman
April 30, 2021
Page 11



The seven individuals listed above are high-level employees who were not involved with day-to-day decision making regarding Tasigna®. All seven of them held V.P.-level positions and oversaw multiple products. The Court in *Lauris* denied plaintiffs' request for emails from such individuals as unduly burdensome, including for Mr. Drouet. *Lauris* Order at 6-8. Their emails concerning Tasigna® would consist in large part of reports from the Tasigna® team for whom we are already producing documents. Communications from the Tasigna® team to these high-level executives likely would be captured by the documents from other custodians that have been or will be produced and these executives are unlikely to have unique documents that are not captured within the productions of other custodians. These seven high-level employees are also responsible for many products, not just Tasigna®. Productions from these seven high-level executives would involve additional burden beyond custodians who worked primarily or exclusively on Tasigna® on a day-to-day basis. This additional burden arises because NPC must ensure that the large volumes of irrelevant, but highly proprietary and confidential material related to other products are not inadvertently produced. Accordingly, productions from these seven custodians is unduly burdensome and not proportional to the needs of the case.

**III.    NPC Will Seek to Shift Costs for Additional Custodians.**

The fifty-seven custodians plaintiffs propose have more than 5.9 terabytes (over 5,900 gigabytes) of data that would need to be processed and have search terms and date restrictions to be applied, then reviewed.[6] There is considerable cost associated simply with hosting and storing this amount of data, putting aside any costs for actual search, review and production. Hosting a litigation database all of the data identified to date for the fifty-seven custodians would cost in excess of $400,000 per year. That amount does not take into account the actual costs of the human review, the discovery consultants organizing the process, or other technologies and processes needed for discovery. In *Lauris*, NPC produced documents from fourteen custodians amounting to over 460,000 documents and more than 9.2 million pages. In total, NPC has already produced to plaintiffs in excess of 480,000 documents, comprising of more than 530 gigabytes of data, and an estimated more than 10.8 million pages. Each custodian added imposes additional costs associated with storage, searching, review and production. In addition, plaintiffs insisted that NPC not use email threading to reduce the production of duplicative copies of emails, which significantly increases the burden to NPC associated with the review and production of duplicative emails. If plaintiffs seek additional custodians beyond those NPC agrees to in Section I., NPC will seek cost shifting for those additional custodians.

---

[6] NPC will search data that is reasonably available for documents to produce from any agreed-upon custodians.

Raymond C. Silverman
April 30, 2021
Page 12



    NPC remains willing to meet and confer further with plaintiffs to select appropriate custodians for production in this case, including considering additional custodians. Given the volume of data already at issue, however, additions would need to be subject to an agreement regarding cost shifting.

                              Sincerely,

                              Elyse Shimada

cc:    Christopher Oxx, Esq.
       Harrison Biggs, Esq.
       Richard Elias, Esq.
       Todd Friedman, Esq.
       Mark Ostrowski, Esq.